1  Sanford Shatz        State Bar No. 127229
2  Sandy_Shatz@Countrywide.com
   5220 Las Virgenes Road, MS:  AC-11
3  Calabasas, California 91302
   Telephone:  (818) 871-6062
4  Fax:  (818) 871-4669

5
   Attorneys for Defendants Countrywide Home Loans, Inc. and
6  Angelo Mozilo [sued erroneously as "Angelo Mancello"]

7

8              UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10

11 LUZ-MARIA URZUA, CESAR            )  Case No.:  C 07-06349 JSW
   ANCHANTE-MARTINELLI              )
12 Sramineus Homo, US Vessel        )  Hon. Jeffrey S. White
                                    )  Courtroom: 2
13                                  )
            Libellant,              )
14                                  )  Related Case No. C 07-5906 JSW
                                    )  Related Case No. C 07-5932 JSW
15     V.                           )  Related Case No. C 07-5931 JSW
                                    )  Related Case No. C 07-5903 JSW
16 COUNTRYWIDE HOME LOANS, ANGELO )
   MANCELLO, PRESIDENT, US Vessel   )
17 DOES, ROES, and MOES 1-100 et al, )  File Date:    November 21, 2007
   US Vessel sand                   )  Trial Date:    Not Assigned
18                                  )
19          Libellees,              )
                                    )
20 _____)  NOTICE OF MOTION AND MOTION TO
   Luz-Maria: Urzua, Cesar: Anchante-Martinetti )  DISMISS BY COUNTRYWIDE HOME
21 Lien Holder of the Vessel, the Real Party In )  LOAN, INC. AND ANGELO MOZILO;
   Interest, Lawful Woman, Man Injured Third )  MEMORANDUM OF POINTS AND
22 Party Intervener/Petitioner/Libellant,  )  AUTHORITIES; REQUEST FOR JUDICIAL
                                    )  NOTICE
23     V.                           )  [F.R.C.P. Rule 12(b)(6); F.R.C.P. Rule 12(e)]
                                    )
24 COUNTRYWIDE HOME LOANS, ANGELO )
25 MANCELLO, PRESIDENT, U.S. Vessel )  Date:        April 4, 2008
   DOES, ROES, and MOES 1-100 et al )  Time:        9:00 a.m.
26       US VESSELS                 )  Courtroom:   2
   INDIVIDUALLY AND SEVERALLY       )
27 Third Party Defendants/Libellees  )
28 _____)

MOTION TO DISMISS BY COUNTRYWIDE HOME LOANS, INC. AND ANGELO MOZILO;
MEMORANDUM OF POINTS AND AUTHORITIES; REQUEST FOR JUDICIAL NOTICE

1    TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

2    PLEASE TAKE NOTICE that on April 4, 2008, at 9:00 a.m., or as soon thereafter as the

3    matter may be heard in Courtroom 2 of the above-entitled court located at 450 Golden Gate

4    Avenue, San Francisco, California 94102, defendants Countrywide Home Loans, Inc. and

5    Angelo Mozilo (erroneously named and served as "Angelo Mancello") (collectively

6    "Countrywide" or "Defendants" unless referred to individually or otherwise), will move to

7    dismiss the "PETITIiveON [sic] FOR LIBEL OF REVIEW OF AN ADMINISTRATIVE

8    JUDGMENT" ("Complaint" or Com.") filed by plaintiffs Luz-Maria Urzua and Cesar Anchante-

9    Martinetti ("Plaintiffs"). This motion to dismiss is made pursuant to Federal Rule of Civil

10   Procedure, Rule12(b)(6), or in the alternative for a more definite statement pursuant to Federal

11   Rule of Civil Procedure, Rule 12(e), on the grounds that Plaintiffs fail to state a claim upon

12   which relief can be granted against Countrywide, and the Complaint is so vague and ambiguous

13   that Countrywide cannot reasonably be required to frame a responsive pleading.

14   This motion is made on the grounds that Plaintiffs' Complaint fails to state a claim of any

15   type against Countrywide in that the Complaint is incomprehensible and unintelligible; the

16   Complaint purports to assert claims against at least two (possibly three) defendants, yet the

17   Complaint lumps all defendants together as though a single entity, without stating a claim against

18   each, or identifying what any particular defendant did which would give rise to a cognizable

19   claim; each time a specific defendant is mentioned, no specific facts are alleged against that

20   defendant related to any claim; there are no facts alleged about Countrywide Home Loans, Inc. or

21   Angelo Mozilo; there are no facts alleged about Countrywide Home Loans, Inc. or Angelo

22   Mozilo related to any specific claim; no specific claim is identified; Plaintiffs allege no wrongful

23   conduct by Countrywide Home Loans, Inc. and/or Angelo Mozilo; and Plaintiffs' purported

24   claims do not exist.

25   If Plaintiffs' Complaint is challenging Countrywide's ability to pursue foreclosure of

26   certain property owned by Plaintiffs and subject to a note secured by deed of trust, Plaintiffs fail

27   to allege that they repaid the loan obtained, and they lack standing to challenge foreclosure of the

28   subject property because they have not tendered the undisputed amount owing.

MOTION TO DISMISS BY COUNTRYWIDE HOME LOANS, INC. AND ANGELO MOZILO;
MEMORANDUM OF POINTS AND AUTHORITIES; REQUEST FOR JUDICIAL NOTICE

1    In addition, Plaintiffs' Complaint is so vague and ambiguous that Countrywide is unable

2 to determine the nature of the claims allegedly asserted against them, and the Complaint must be

3 rewritten so that these Defendants can frame a responsive pleading.

4    This motion to dismiss is based upon this notice of motion and motion, the attached

5 memorandum of points and authorities, the attached request for judicial notice, the files,

6 pleadings and records in this action, and upon such other and further oral and documentary

7 evidence as may be presented at the hearing of the motion.

8    Should other Countrywide entities or persons be named as parties to this action, the

9 undersigned acknowledges that he is appearing on behalf of those entities or persons as well.

10

11 DATED: February 21, 2008          By: _____

12                                         SANFORD SHATZ
                                           Attorneys for Defendants
13                                         Countrywide Home Loans, Inc.
                                           and Angelo Mozilo
14                                         [sued erroneously as "Angelo Mancello"]

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION TO DISMISS BY COUNTRYWIDE HOME LOANS, INC. AND ANGELO MOZILO;
MEMORANDUM OF POINTS AND AUTHORITIES; REQUEST FOR JUDICIAL NOTICE

**MEMORANDUM OF POINTS AND AUTHORITIES**

I.    INTRODUCTION.

This case arises out of Plaintiffs Luz-Maria Urzua and Cesar Anchante-Martinetti's ("Plaintiffs") default on a mortgage loan encumbering real property, which loan is currently serviced by Countrywide Home Loans, Inc. bearing Loan No. 118875074. It appears that after Plaintiffs obtained the loan and began making payments to Countrywide Home Loans, Inc., they defaulted and Countrywide Home Loans, Inc. began foreclosure proceedings. In a desperate effort to avoid foreclosure sale on the property, Plaintiffs filed this action seeking to divert attention from their failure to make mortgage payments. Plaintiffs' Complaint alleges assorted nonsense concerning the loan, which claims are so indecipherable that Countrywide cannot begin to address them. It does appear unequivocally however, that Plaintiffs obtained the loan, which is being serviced by Countrywide Home Loans, Inc., and that their sole obligation is to repay that loan. Because Plaintiffs have not repaid the loan, Countrywide Home Loans, Inc. is entitled to proceed with foreclose proceedings. There is no merit whatsoever to Plaintiffs' purported claims and they should be dismissed.

Countrywide respectfully requests that the court dismiss Plaintiffs' Complaint or order them to re-plead it. Plaintiffs do not assert a cognizable claim against Countrywide. Their claim relating to theft and kidnap pursuant to Title 18 U.S.C. §§ 661 and 1201 fail in that it is completely unintelligible and Countrywide cannot apprise itself of what violations it is alleged to have committed and to what it must defend itself. Any claims relating to admiralty violations are inapplicable because neither Countrywide Home Loans, Inc. nor Angelo Mozilo are boats or high seas vessels. Rather, Countrywide Home Loans, Inc., a New York corporation, is a wholly owned subsidiary of Countrywide Financial Corporation, a Delaware corporation, licensed to do business in and is doing business in California. Mr. Mozilo is chairman and CEO of Countrywide Financial Corporation.

Furthermore, regardless of the validity of Plaintiffs' vague claims, they have not repaid their mortgage and lack standing to challenge the sale of the subject property. Unless and until Plaintiffs specify their claims against Countrywide, the court should dismiss their Complaint.

1   Alternatively, if Plaintiffs are attempting to challenge Countrywide's ability to pursue a

2   foreclosure sale of the subject property, unless and until they tender the undisputed amount

3   owing, they lack standing to prosecute this action and their claims should be dismissed. Since

4   there is no basis to the claims, they should be dismissed.

5

6   II.    SUMMARY OF FACTS.

7          A.     Parties.

8          On or about April 4, 2006, Plaintiffs Luz-Maria Urzua and Cesar Anchante-Martinetti,

9   wife and husband as community property, borrowed money from Stearns Lending, Inc. to

10  purchase real property located at 3785 North Lake Road, in Merced, California 95340 (the

11  "property"). The property is secured by a deed of trust recorded on April 10, 2006, in the

12  Official Records, Merced County Recorder's Office, as Instrument No. 2006-025513, securing a

13  loan for $607,500.00. *See* Request for Judicial Notice ("RJN"), Ex. "A." The caption page

14  indicates that Plaintiffs are suing Countrywide Home Loans, Inc. and Angelo Mancello,

15  President. (Com., p. 1.) Plaintiffs allege no facts regarding any of the Countrywide defendants

16  individually, their Complaint does not differentiate any one defendant, and all Countrywide

17  defendants are lumped together as though as a single entity.

18         B.     Plaintiffs' Loan And Their Alleged Claims.

19         Plaintiffs do not allege anything about their loan nor the property. This is surprising in

20  that it is the loan, the property, and Plaintiffs' breach that brings us before this court. In their

21  description of the purported "Facts" Plaintiffs simply tell us that they served Countrywide Home

22  Loans with a Proof of Claim, a Letter Rogatory, and an Affidavit. (Com. p. 5.) None of these

23  documents is attached to the Complaint. Plaintiffs also reference serving Countrywide Home

24  Loans with a Notice of Fault – Opportunity to Cure, Notice of Default an [sic] Certificate of

25  Dishonor, Invoice, Notice for Demand and Settlement for Closing of the Escrow. None of these

26  documents is attached to the Complaint either. Further, Plaintiffs do not allege how any of these

27  documents relate to their purported claim. (Com. p. 6.)

28  / / /

MOTION TO DISMISS BY COUNTRYWIDE HOME LOANS, INC. AND ANGELO MOZILO;
MEMORANDUM OF POINTS AND AUTHORITIES; REQUEST FOR JUDICIAL NOTICE

1       The Complaint then alleges that this court is mandated to "enforce the

2   Agreement/Contract" and grant the relief as sought in the Accounting and True Bill (none of

3   which is described or attached to the Complaint).  Further, that should the court dismiss this

4   action, that its determination is void pursuant to FRCP 60(b)(4) for "lack of subject matter

5   jurisdiction and judicial misconduct and Scienter Criminal Act without immunity."  (Com. p. 6.)

6   Plaintiffs allege "insurance fraud, mail fraud, wire fraud, and conspiracy to commit such, and

7   undue enrichment, fraud, and numerous other Scienter Acts" yet fail to cite any applicable

8   statutes or provide facts to support such claims.  (Com. p. 7.)  The Plaintiffs assert they are the

9   holder in due course of the "US Vessel and its Trade Name by security agreement," however

10  there are no facts to support such a preposterous claim.

11      Frankly speaking, Countrywide is hard-pressed to comprehend what the Complaint has to

12  do with the loan made to Plaintiffs which is serviced by Countrywide or their failure to repay the

13  same.

14      No further facts are alleged about any of these claims.

15      Even Plaintiffs' prayer for relief is vague, incomprehensible, and unrelated to

16  Countrywide – so much so that Countrywide is unable to properly identify or address the relief

17  requested.  For example, Plaintiffs ask the court to:  (1) enforce some unknown and undisclosed

18  agreement/contract (Com. p. 8); (2) pay Plaintiffs the sum of $64,774,742.40 pursuant to an

19  unspecified and/or ambiguous "perfected" agreement (Com. p. 8); (3) order that Countrywide

20  Bank cancel liens recorded against Plaintiffs (Com. p. 8); (4) order a "Data Integrity Board and

21  Comptroller of the Currency Investigation pursuant to 5 U.S.C. 552(a)(d) [Freedom of

22  Information Act]; and (5) declare that anyone appearing before the court after default in some

23  unknown "Administrative Law Process" be found to have committed a criminal act mandating

24  arrest (Com. p. 8.)

25      There is no merit whatsoever to these claims or the relief associated with them.

26  / / /

27  / / /

28  / / /

MOTION TO DISMISS BY COUNTRYWIDE HOME LOANS, INC. AND ANGELO MOZILO;
MEMORANDUM OF POINTS AND AUTHORITIES; REQUEST FOR JUDICIAL NOTICE

III.     PLAINTIFFS' COMPLAINT SHOULD BE DISMISSED BECAUSE IT FAILS TO

         STATE A CLAIM AGAINST COUNTRYWIDE.

         A.      Rule 12(b)(6).

         Federal Rule of Civil Procedure 12(b) provides that "[e]very defense, in law or fact, to a

claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim,

shall be asserted in the responsive pleading thereto if one is required, except that the following

defenses may at the option of the pleader be made by motion: … (6) failure to state a claim upon

which relief can be granted …."  The court must decide whether the facts alleged, if true, would

entitle plaintiff to some form of legal remedy.  If the answer is unequivocally, "no", the motion

must be granted.  Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102 (1957).

         B.      Plaintiffs Lacks Standing To Pursue Their Claims Because They Have Not

                 Tendered, Nor Alleged That They Tendered, The Undisputed Obligation In Full.

         To the extent that Plaintiffs are challenging any proposed foreclosure sale of the subject

property, they may not do so until they have tendered the undisputed obligation in full.  The

tender requirement applies to "any cause of action for irregularity in the sale procedure."

Abdallah v. United Savings Bank, 43 Cal. App. 4th 1101, 1109 (1996) (affirming sustaining of

demurrer without leave to amend):

> "It would be futile to set aside a foreclosure sale on the technical
>
> ground that notice was improper, if the party making the challenge
>
> did not first make full tender and thereby establish his ability to
>
> purchase the property."

United States Cold Storage v. Great W. Sav. & Loan Ass'n, 165 Cal. App. 3d 1214, 1225 (1985)

(affirming judgment of nonsuit).

         The requirement that a tender of the amount owing is necessary before a foreclosure sale

can be challenged applies to any claim implicitly integrated with the foreclosure sale.  Arnolds

Management Corp. v. Eischen, 158 Cal. App. 3d 575, 579 (1984).  "A cause of action 'implicitly

integrated' with the irregular sale fails unless the trustor can allege and establish a valid tender."

(Affirming sustaining of demurrer without leave to amend on claims of wrongful foreclosure,

1  fraud, and negligence relating to defective notice of foreclosure sale; *see also* <u>Karlsen v.</u>

2  <u>American Sav. & Loan Ass'n</u>, 15 Cal. App. 3d 112, 121 (1971) (holding plaintiff's claims for

3  breach of oral agreement, for an accounting, and for constructive trust fail because plaintiff never

4  made a valid tender.)) "To hold otherwise would permit plaintiffs to state a cause of action

5  without the necessary element of damage to themselves." <u>Arnolds Management Corp.</u>, <u>supra</u>,

6  158 Cal. App.3d at 580.

7       There is no basis to enjoin Countrywide's foreclosure sale of Plaintiffs' deed of trust.

8  The sole purpose of the Complaint appears to be to delay, slow down, or stop Countrywide's

9  foreclosure efforts.  Plaintiffs lack standing to challenge the foreclosure action because they have

10  not tendered, nor alleged that they tendered, the undisputed amount owing on the subject loan.

11  Plaintiffs have not alleged that they made any payments on the loans, that the loan is otherwise

12  invalid, that their signatures were forged, or that there was any defect in the assignment of the

13  loan to Countrywide.

14       Simply put, there is no basis to Plaintiffs' claims, they lack standing to pursue them, and

15  they should be dismissed.

16       C.    <u>Plaintiffs Fails To Allege Sufficient Facts To State A Claim.</u>

17       Plaintiffs' Complaint is woefully void of any specific causes of action.  Plaintiffs fail to

18  allege any facts concerning the origination or servicing of their loan.  In fact, due to the

19  completely unintelligible nature of the Complaint, Countrywide cannot even begin to apprise

20  itself of what violations it is alleged to have committed and to what it must defend itself against.

21  It appears at some points in the Complaint that Countrywide is being sued for some breach of

22  admiralty law, kidnapping, fraud, and assorted other transgressions however, there are no specific

23  charging allegations against Countrywide Home Loans, Inc. or Angelo Mozilo.

24       Any challenge to Countrywide's ability to pursue foreclosure of the subject property fails

25  because Plaintiffs do not allege they repaid the loan obtained and thus lack standing to challenge

26  foreclosure because they have not tendered the undisputed amount owing.  Further, Plaintiffs'

27  Complaint is completely unintelligible, leaving Countrywide unable to apprise itself of what

28  / / /

MOTION TO DISMISS BY COUNTRYWIDE HOME LOANS, INC. AND ANGELO MOZILO;
MEMORANDUM OF POINTS AND AUTHORITIES; REQUEST FOR JUDICIAL NOTICE

1  violations it is alleged to have committed and to what it must defend itself. Plaintiffs' admiralty

2  claims do not apply to Countrywide and have no place in these proceedings.

3       Regardless of the purported validity of Plaintiffs' claims, they have not repaid their

4  mortgage and lack standing to challenge foreclosure sale of the subject property.

5       There is no basis to these claims. There is no merit to these claims. The claims are made

6  simply to stall foreclosure of the subject property. The Complaint should be dismissed.

7

8  IV.    IF THE COURT DOES NOT DISMISS THE COMPLAINT, THE COURT SHOULD

9        ORDER PLAINTIFFS TO PROVIDE A MORE DEFINITIVE STATEMENT OF THEIR

10        CLAIMS AGAINST COUNTRYWIDE.

11       Federal Rules of Civil Procedure Rule 12(e) provides that "[i]f a pleading to which a

12  responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be

13  required to frame a responsive pleading, the party may move for a more definite statement before

14  interposing a responsive pleading." In the present case, Plaintiffs' Complaint is

15  incomprehensible and barely mentions any facts about the Countrywide defendants. It is

16  difficult, at best, to even understand why Countrywide Home Loans, Inc. or Angelo Mozilo are

17  parties in this litigation. Therefore, in the event that the court is not inclined to dismiss the action

18  based on Plaintiffs' lack of standing and failure to allege facts sufficient to constitute a cause of

19  action against these responding parties, Countrywide respectfully requests that Plaintiffs be

20  ordered to provide these responding parties with a more definitive statement of their claims to

21  afford the Countrywide defendants with an opportunity to address Plaintiffs' claims and frame a

22  responsive pleading as mandated by Rule 12(e).

23

24  V.    CONCLUSION.

25       Plaintiffs strings together 9 pages of text without mentioning the Countrywide defendants

26  as individual entities, without specifying any (wrongful) acts or omissions undertaken by any of

27  the Countrywide defendants, without explaining Countrywide's role in their lives, without

28  providing any basis to show that the Countrywide defendants acted wrongfully, and without even

MOTION TO DISMISS BY COUNTRYWIDE HOME LOANS, INC. AND ANGELO MOZILO;
MEMORANDUM OF POINTS AND AUTHORITIES; REQUEST FOR JUDICIAL NOTICE

1    identifying the claims asserted against the Countrywide defendants.  Nothing about the

2    Complaint is at all discernible.  Plaintiffs' have a loan serviced by Countrywide Home Loans,

3    Inc. which loan is currently in default and subject to foreclosure.  Unless and until Plaintiffs are

4    able to state sufficient facts to constitute a claim against the Countrywide defendants,

5    Countrywide respectfully requests that the court dismiss this action in its entirety or, in the

6    alternative, order that Plaintiffs provide Countrywide with a more definitive statement as to their

7    claim against these responding parties.

8

9    DATED: February 21, 2008           By: _____

10                                            SANFORD SHATZ
                                           Attorneys for Defendants
11                                          Countrywide Home Loans, Inc.
                                           and Angelo Mozilo
12                                          [sued erroneously as "Angelo Mancello"]

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1          REQUEST FOR JUDICIAL NOTICE

2          Defendants Countrywide Home Loans, Inc. and Angelo Mozilo (collectively

3  "Countrywide") request, pursuant to Federal Rules of Evidence Rule 201, that the court take

4  judicial notice of the following document recorded in the recorder's office of the applicable

5  county and state.  A true and correct copy of the document is attached to this request for judicial

6  notice as follows:

7          1.       Exhibit "A":  Deed of Trust recorded on April 10, 2006, as Instrument No. 2006-

8  025513, in the Official Records, Merced County Recorder's Office, and securing a loan for

9  $607,500.00 given by borrowers Luz-Maria Urzua and Cesar Anchante-Martinetti, wife and

10 husband as community property, to lender Stearns Lending, Inc., using property located at 3785

11 North Lake Road, Merced, California 95340.

12         Countrywide requests that the court take judicial notice of the foregoing document on the

13 grounds that it is not subject to reasonable dispute in that it is generally known within the

14 territorial jurisdiction of the trial court and is capable of accurate and ready determination.

15

16 DATED: February 21, 2008          By:  _____

17                                          SANFORD SHATZ
                                            Attorneys for Defendants
18                                          Countrywide Home Loans, Inc.
                                            and Angelo Mozilo
19                                          [sued erroneously as "Angelo Mancello"]

20

21

22

23

24

25

26

27

28

Exhibit "A"

| Recorded In Official Records, Merced County | 4/10/2006 |
|---|---|
| **M. STEPHEN JONES** County Recorder | 8:00 AM R07 |

| CH  Chicago Title Company | | T |
|---|---|---|
| Doc#:  2006-025513 | Titles: 1 | Pages: 25 |
| | Fees | 81.00 |
| | Taxes | 0.00 |
| | Other | 0.00 |
| | **PAID** | **$81.00** |

```
009019910   URZUA        L
.610  118875074 D2 001 001
```

Recording Requested By:
STEARNS LENDING, INC.

Return To:
STEARNS LENDING, INC.

4 HUTTON CENTRE DRIVE, SUITE 500
SANTA ANA, CA 92707

Prepared By:

STEARNS LENDING, INC.
4 HUTTON CENTRE DRIVE, SUITE 500
SANTA ANA, CA 92707

———————————[Space Above This Line For Recording Data]———————————

# DEED OF TRUST

LOAN NO.:  06036324
ESCROW NO.:  05-66001925-CL

MIN  100183300000290594
MERS Phone: 1-888-679-6377

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated          APRIL 04, 2006
together with all Riders to this document.
(B) "Borrower" is
LUZ-MARIA URZUA AND CESAR ANCHANTE-MARTINETTI, WIFE AND HUSBAND AS COMMUNITY PROPERTY

Borrower's address is 6787 HILLSVIEW DRIVE, VACAVILLE, CA  95688
Borrower is the trustor under this Security Instrument.
(C) "Lender" is
STEARNS LENDING, INC., A CALIFORNIA CORPORATION

Lender is a  CORPORATION
organized and existing under the laws of  CALIFORNIA

Initials:

Lender's address is
4 HUTTON CENTRE DRIVE, SUITE 500, SANTA ANA, CA 92707
(D) "Trustee" is
CARRIAGE ESCROW INC., A CALIFORNIA CORPORATION
(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(F) "Note" means the promissory note signed by Borrower and dated         APRIL 04, 2006
The Note states that Borrower owes Lender

SIX HUNDRED SEVEN THOUSAND FIVE HUNDRED AND NO/100 X X X X X X X X X X X X X X X X X X
                                                                                           Dollars

(U.S. $ 607,500.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than    MAY 01, 2036
(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(I) "RIDERS" means all riders to this Security Instrument that are executed by Borrower. The following riders are to be executed by Borrower [check box as applicable]:

| [XX] Adjustable Rate Rider | [   ] Condominium Rider | [XX] 1-4 Family Rider |
| [   ] Graduated Payment Rider | [   ] Planned Unit Development Rider | [   ] Biweekly Payment Rider |
| [   ] Balloon Rider | [   ] Rate Improvement Rider | [   ] Second Home Rider |
| [   ] Other(s) [specify] | | |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments, and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(M) "Escrow Items" means those items that are described in Section 3.
(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.
(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

Initials:

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

| COUNTY | of | MERCED | |
|---|---|---|---|
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] | |

PARCEL 1, AS SHOWN ON THAT CERTAIN PARCEL MAP FOR WILLIAM F. SEGHY, FILED FOR RECORD ON OCTOBER 10, 1973, IN VOLUME 23 OF PARCEL MAPS, PAGE 4, AND BEING A PORTION OF LOT 20, ACCORDING TO MAP ENTITLED, "PLAT OF THE YOSEMITE COLONY" RECORDED FEBRUARY 11, 1888, IN BOOK 1 OF MAPS, PAGE 7, MERCED COUNTY RECORDS.

Parcel ID Number: 060-670-14                                    which currently has the address of
                        3785 NORTH LAKE ROAD                                    [Street]
              MERCED                              [City], California       95340-       [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances

Initials

VMP-6A(CA) (0207)                              Page 3 of 15                              Form 3005 1/01

of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than twelve monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than twelve monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

VMP-6A(CA) (0207)                          Page 11 of 15                          Form 3005  1/01

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. **Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. **Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any RIDER executed by Borrower and recorded with it.

Witnesses:

_____
-Witness

_____
-Witness


_____ (Seal)          _____ (Seal)
LUZ-MARIA URZUA                 -Borrower        CESAR ANCHANTE-MARTINETTI        -Borrower

_____ (Seal)          _____ (Seal)
                                -Borrower                                         -Borrower

_____ (Seal)          _____ (Seal)
                                -Borrower                                         -Borrower

_____ (Seal)          _____ (Seal)
                                -Borrower                                         -Borrower

State of CALIFORNIA
County of Solano                                      } ss.

On  4-5-06                    before me,  Lacie R Lopez, Notary Public
                                                          personally appeared

LUZ-MARIA URZUA AND CESAR ANCHANTE-MARTINETTI

, personally known to me
(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed
to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity
upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____ (Seal)

LACIE R. LOPEZ
COMM. #1484208
NOTARY PUBLIC • CALIFORNIA
SOLANO COUNTY
Comm. Exp. APRIL 19, 2008

Initials

VMP-8A(CA) (0207)                 Page 15 of 15                 Form 3005  1/01

# 1-4 FAMILY RIDER
## (Assignment of Rents)

LOAN NO.:  06038324

MIN: 100183300000290594
MERS Phone: 1-888-679-6377

THIS 1-4 FAMILY RIDER is made this    4th    day of    APRIL, 2006    , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to

STEARNS LENDING, INC., A CALIFORNIA CORPORATION

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

3785 NORTH LAKE ROAD, MERCED, CA  95340-
[Property Address]

1-4 FAMILY COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT. In addition to the Property described in the Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security Instrument as the "Property."

Initials:

Form 3170 1/01

MULTISTATE 1- 4 FAMILY RIDER - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
V-57R (0411)                          Page 1 of 4          LENDER SUPPORT SYSTEMS INC. 57R.NEW (03/05)

**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**C. SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

**D. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Section 5.

**E. "BORROWER'S RIGHT TO REINSTATE" DELETED.** Section 19 is deleted.

**F. BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

**G. ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until: (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument, and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

Initials:

**V-57R (0411)**          Page 2 of 4          Form 3170 1/01

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

I. **CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

**V-57R (0411)**                     Page 3 of 4                     Form 3470 1/01

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this 1-4 Family Rider.

_____ (Seal)          _____ (Seal)
LUZ MARIA URZUA          -Borrower        CESAR ANCHANTE-MARTINETTI   -Borrower

_____ (Seal)          _____ (Seal)
                         -Borrower                                   -Borrower

_____ (Seal)          _____ (Seal)
                         -Borrower                                   -Borrower

_____ (Seal)          _____ (Seal)
                         -Borrower                                   -Borrower

V-57R (0411)                    Page 4 of 4                    Form 3170 1/01

# ADJUSTABLE RATE RIDER
## (MTA-Twelve Month Average Index – Payment Caps)

LOAN NO.:  06038324

MIN: 100183300000290594
MERS Phone: 1-888-679-6377

THIS ADJUSTABLE RATE RIDER is made this 4th day of          APRIL, 2006          , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to STEARNS LENDING, INC., A CALIFORNIA CORPORATION

("Lender") of the same date and covering the property described in the Security Instrument and located at:

3785 NORTH LAKE ROAD, MERCED, CA  95340-

[Property Address]

**THE NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT STATED IN THE NOTE.**

**ADDITIONAL COVENANTS:** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agrees as follows:

### A. INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for changes in the interest rate and the monthly payments, as follows:

### 2. INTEREST
**(A) Interest Rate**
Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of          3.000          %. The interest rate I will pay may change.
The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of the Note.

**(B) Interest Rate Change Dates**
The interest rate I will pay may change on the   1st   day of          JUNE, 2006          , and on that day every month thereafter. Each date on which my interest rate could change is

PayOption MTA ARM Rider

Initials:

FE-5315  (0511)  Page 1 of 6    LENDER SUPPORT SYSTEMS, INC. COU-5315.COU (01/06)

called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. The interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3.

### (C) Index

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (D) Calculation of Interest Rate Changes

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding        THREE AND 325/1000THS        percentage point(s)      3.325        % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest will never be greater than      9.950      %. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

### 3. PAYMENTS

#### (A) Time and Place of Payments

I will make a payment every month.

I will make my monthly payments on the 1st day of each month beginning on     JUNE, 2006        . I will make these payments every month until I have paid all the Principal and Interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on      MAY 01, 2036        , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at STEARNS LENDING, INC.
4 HUTTON CENTRE DRIVE, SUITE 500, SANTA ANA, CA 92707
or at a different place if required by the Note Holder.

#### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S. $      2,561.24      unless adjusted under Section 3(F).

PayOption MTA ARM Rider
FE-5315  (0511)                    Page 2 of 6                    Initials:

**(C) Payment Change Dates**

My monthly payment may change as required by Section 3(D) below beginning on the 1st day of        JUNE, 2007        , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The "Minimum Payment" is the minimum amount Note Holder will accept for my monthly payment which is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below. If the Minimum Payment is not sufficient to cover the amount of the interest due then negative amortization will occur.

I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

**(D) Calculation of Monthly Payment Changes**

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) apply, the amount of my new monthly payment effective on a Payment Change Date, will not increase by more than 7.5% of my prior monthly payment. This 7.5% limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and Interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment. I also have the option to pay the Full Payment for my monthly payment.

**(E) Additions to My Unpaid Principal**

Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the payment limitations described in Section 3(D), my Minimum Payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3(A).

PayOption MTA ARM Rider
FE-5315  (0511)                      Page 3 of 6                      Initials: _____

**(F) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid Principal can never exceed the Maximum Limit equal to ONE HUNDRED FIFTEEN AND 000/1000THS        percent ( 115.000 %) of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments and interest rate increases. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the 7.5% Payment Cap. The new Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate.

**(G) Required Full Payment**

On the    fifth    Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

**(H) Payment Options**

After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment options that are greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:

(i)    **Interest Only Payment:** the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.

(ii)    **Fully Amortized Payment:** the amount necessary to pay the loan off (Principal and Interest) at the Maturity Date in substantially equal payments.

(iii)    **15 Year Amortized Payment:** the amount necessary to pay the loan off (Principal and Interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.

These Payment Options are only applicable if they are greater than the Minimum Payment.

**B.    TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Section 18 of the Security Instrument entitled "Transfer of the Property or a Beneficial Interest in Borrower" is amended to read as follows:

PayOption MTA ARM Rider
FE5315  (0511)                              Page 4 of 6                              Initials: _____

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Pay Option MTA ARM Rider
FE5315  (0511)                    Page 5 of 6                    Initials:

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)
LUZ-MARIA URZUA                 -Borrower

_____ (Seal)
CESAR ANCHANTE-MARTINETTI       -Borrower

_____ (Seal)
                                -Borrower

_____ (Seal)
                                -Borrower

_____ (Seal)
                                -Borrower

_____ (Seal)
                                -Borrower

_____ (Seal)
                                -Borrower

_____ (Seal)
                                -Borrower

PayOption MTA ARM Rider
FE-5315  (0511)                 Page 6 of 6

# PROOF OF SERVICE

I am over the age of 18 years and not a party to the within action. I am employed by Countrywide Home Loans, Inc. My business address is 5220 Las Virgenes Road, MS: AC-11, Calabasas, California 91302.

On February 22, 2008, I served NOTICE OF MOTION AND MOTION TO DISMISS BY COUNTRYWIDE HOME LOAN, INC. AND ANGELO MOZILO; MEMORANDUM OF POINTS AND AUTHORITIES; REQUEST FOR JUDICIAL NOTICE on each person or entity name below by enclosing a copy in an envelope addressed as shown below and placing the envelope for collection and mailing on the date and at the place shown below following our ordinary office practices. I am readily familiar with the practice of this office for collection and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in a sealed envelope with postage fully prepaid.

Date of Mailing:        February 22, 2008

Place of Mailing:       Calabasas, California

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on February 22, 2008, at Calabasas, California.

_____
Desiree Rais

MOTION TO DISMISS BY COUNTRYWIDE HOME LOANS, INC. AND ANGELO MOZILO;
MEMORANDUM OF POINTS AND AUTHORITIES; REQUEST FOR JUDICIAL NOTICE

1

## SERVICE LIST

2

3

4
Luz-Maria Urzua                          Cesar Anchante-Martinetti
6787 Hillsview Drive                     6787 Hillsview Drive
Vacaville, California 95688              Vacaville, California 95688

5

6
Luz-Maria Urzua                          Cesar Anchante-Martinetti
3785 North Lake Road                     3785 North Lake Road
Merced, California 95340                 Merced, California 95340

7

8

9
Luz-Maria Urzua                          Cesar Anchante-Martinetti
97 Dobbins Street, Suite B              97 Dobbins Street, Suite C
Vacaville, California 95688              Vacaville, California 95688

10

11
Luz-Maria Urzua                          Cesar Anchante-Martinetti
324 Stevenson Street                     324 Stevenson Street
Vacaville, California 95688              Vacaville, California 95688

12

13

14
Luz-Maria Urzua                          Cesar Anchante-Martinetti
965 Alamo Drive, Suite 178              965 Alamo Drive, Suite 178
Vacaville, California 95687              Vacaville, California 95687

15

16
Luz-Maria Urzua                          Cesar Anchante-Martinetti
419 Mason Street, Suite 208             419 Mason Street, Suite 208
Vacaville, California 95688              Vacaville, California 95688

17

18
Luz-Maria Urzua                          Cesar Anchante-Martinetti
3801 North Lake Rd.                      3801 North Lake Rd.
Merced, CA  95340                        Merced, CA  95340

19

20

21
Luz Maria Urzua
2041 Legends Court
Merced, CA  95340

22

23

24
John J. Kralik, IV
Kralik & Jacobs
650 North Sierra Madre Villa Ave.
Suite 302
Pasadena, CA  91107

25

26

27

28
Jack R. Nelson
Keith David Yandell
Reed Smith LLP
1999 Harison Street, Suite 2400
Oakland, CA  94612

MOTION TO DISMISS BY COUNTRYWIDE HOME LOANS, INC. AND ANGELO MOZILO;
MEMORANDUM OF POINTS AND AUTHORITIES; REQUEST FOR JUDICIAL NOTICE